IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS J. SHIELDS, JR., )
)
Plaintiff, )
)
v. )          1:18CV602
)
SHERIFF GODFREY, et al., )
)
Defendants. )

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Thomas J.

Shields, Jr., an inmate in the North Carolina Department of Corrections.  Plaintiff originally

named as Defendants: 1) Sheriff Godfrey, Sheriff of Moore County, North Carolina, 2) Lt.

Victor Moore, who is employed by the Moore County Sheriff's Department at the Moore

County Detention Center, 3) "Nurse Jeanie[1]," a nurse at that facility, and 4) the North Carolina

Department of Corrections.   Plaintiff later voluntarily dismissed the North Carolina

Department of Corrections.  (See Order [Doc. #42].)  Previously, Defendant Donaldson filed

a Motion for Summary Judgment [Doc. #38] and Defendants Godfrey and Moore filed a

separate Motion for Summary Judgment [Doc. #44].  The Court later entered an Order [Doc.

#56] which struck those Motions based on certain deficiencies, but without prejudice to

Defendants refiling them.  Defendant Donaldson later filed a new Motion for Summary

---

[1] Counsel for "Nurse Jeanie" identified her as Jeanie Donaldson.  (Notice of Appearance [Doc. #11].)  The Court will therefore refer to her as Nurse Donaldson or Defendant Donaldson.

Judgment [Doc. #61], as did Defendants Godfrey and Moore [Doc. #66]. Plaintiff filed a joint Response [Doc. #73] and Donaldson and Godfrey and Moore filed Replies [Doc. #74, #75]. Plaintiff also filed a "Plaintiff [sic] Request for Judicial Notice of Adjudicative Facts and Opportunity to be Heard" [Doc. #76] and "Plaintiffs' [sic] Evidentiary Objections and Court Sanctions Against Defendant Parties and Their Attorneys of Record" [Doc. #77]. This matter is now before the Court regarding the renewed Motions for Summary Judgment and Plaintiff's two subsequent filings.

<u>Allegations in the Complaint</u>

The Complaint sets out the facts supporting Plaintiff's claims in an attached Statement of Claim. That Statement alleges that Plaintiff was arrested and taken to the Moore County Detention Center, where he received a medical screening. (Complaint [Doc. #2], Attach. ¶¶ 11, 12.) Plaintiff alleges that he informed staff that he was previously diagnosed with multiple sclerosis and that he needed "medical restrictions or a bottom floor, bottom bunk cell." (<u>Id.</u> ¶ 12.) Plaintiff states that he initially received an assignment to a bottom floor, bottom bunk cell in general population housing, but was later moved from general population to administrative housing. (<u>Id.</u> ¶¶ 12-13.) Plaintiff contends that he raised questions about his housing assignment with Defendants Godfrey and Moore over a period of several weeks, specifically asking why he had been placed in administrative housing without any write-up or rule violation. (<u>Id.</u> ¶¶ 15-20, 25.) He contends that he was given vague and conflicting answers regarding why he had been moved to administrative housing, related either to his medical condition, his need for extra bedding (which was also related to his medical condition) and/or concerns that he had been "running the block" in his original cell assignment. He

2

2

Case 1:18-cv-00602-CCE-JEP   Document 83   Filed 02/11/21   Page 2 of 24

further claims that, on September 14, 2015, he was moved to an upper tier cell where he had to ambulate stairs to get to his cell. (Id. ¶ 22.) He alleges that he had previously informed Sheriff Godfrey that he had multiple sclerosis and needed to be housed in a lower floor. (Id. at ¶ 21.) He also claims that he asked Nurse Donaldson why he was moved to an upper tier cell given his multiple sclerosis and difficulty in navigating stairs. (Id. ¶¶ 22-23.) He alleges that she replied that "she had nothing to do with placement of inmates on restrictive housing classification even with chronic medical conditions or medical restrictions." (Id. ¶ 23.) Plaintiff claims that, on September 15, 2015, he asked a jail employee, Sergeant Flint, about his housing and that Flint replied that he was in restrictive housing because of "the Nurse and his chronic medical condition and medical restrictions." (Id. ¶ 25.)

According to the Complaint, Plaintiff suffered dizziness on September 18, 2015, and he informed jail staff, who had his blood pressure checked. (Id. ¶ 26.) On September 19, 2015, he again had his blood pressure checked and after seeing the nurse then asked to see "Sgt. Green" about being moved to a lower tier due to his medical issues, but the request was denied. (Id. ¶ 27.) Two days later, on September 21, 2015, while leaving his cell, Plaintiff fell down the stairs, which caused him to be taken to the hospital with "multiple contusions and severe back pain." (Id. ¶ 28.) He alleges that five days later, on September 26, 2015, he attempted to declare a medical emergency by "telling the Sergeant he was having severe body pains," but that the "request was denied." (Id. ¶ 29.) When he then advised another officer that he was in pain, the officer replied that medical staff does not come in on the weekend. (Id. ¶ 30.) Plaintiff alleges that the next day, he again attempted to declare a medical emergency due to leg pain and blood in his stool, but "was denied medical attention." (Id. ¶ 31.) Finally,

3

Plaintiff alleges that medical staff sent him to see Dr. Sinclair, a neurologist, on October 1, 2015, and that Dr. Sinclair recommended that Plaintiff be referred to Central Prison to manage his medical condition. (Id. ¶ 32.) Plaintiff alleges that on October 20, 2015, he requested to be moved to Central Prison "per Dr. Sinclair's referral" because "they have 24 hours a day, 7 days a week medical doctors at the facility" and because the Moore County Detention Center could not address his medical condition or restrictions. (Id. ¶ 33.) Plaintiff contends that his health was declining due to his chronic medical condition and the lack of medical services at Moore County Detention Center. (Id. ¶ 33.)

Facts Related to Nurse Donaldson's Motion

In conjunction with her initial Motion for Summary Judgment, Nurse Donaldson submitted an Affidavit [Doc. #40] supported by Plaintiff's medical records as an exhibit. She submitted a new Affidavit [Doc. #61, Attach.] in conjunction with her renewed Motion. That second Affidavit appears to contain all the substance of her first Affidavit, along with additional information. Therefore, the Court will reference only the second Affidavit in setting out the facts pertaining to Nurse Donaldson.

Nurse Donaldson states that she is a registered nurse who was employed by Southern Health Partners, Inc. to provide medical care at the Moore County Detention Center while Plaintiff was incarcerated and that she provided him with certain medical care. (Id. ¶¶ 3-5.) During Plaintiff's incarceration, her typical work schedule was 6:30 am to 3:00 pm, Monday through Friday. (Id. ¶ 9.) A physician's assistant, Manuel Maldonado, also visited once a week and was available by telephone. (Id.)

4

At the time of Plaintiff's booking on February 4, 2015, he reported to an officer completing a medical questionnaire that he had high blood pressure, dental pain, a history of multiple sclerosis, and a history of severe headaches and cramps. (Id. ¶ 10 and Ex. 1003.) In a screening conducted by Nurse Donaldson the next day, he reported high blood pressure, a history of multiple sclerosis, a history of cocaine and alcohol use, and a possibly broken finger. (Id. ¶ 11 and Ex. 1001.) Donaldson ordered blood pressure medication for Plaintiff, which was then prescribed by PA Maldonado. (Id. ¶ 16, Ex. 1041.)

Defendant Donaldson states that Plaintiff "did not request to be assigned to housing in a bottom floor cell" (id. ¶ 12) or relay such a request to her at any point in his incarceration (id. ¶ 13). Instead, he "desired to be housed on the second floor" of the Detention Center. (Id. ¶ 14.) However, she adds that as a nurse she has "no knowledge of information regarding the decision to assign housing to inmates" and specifically has "no information on the decision to assign [Plaintiff] to a second floor cell," although she believes that the assignments are made by an officer at the Detention Center. (Id. ¶ 18.) Defendant Donaldson also states that she believes that Plaintiff was assigned to administrative housing on the second floor of the Detention Center at some point during his time there. (Id. ¶ 17.) Defendant Donaldson's assessment of Plaintiff at initial screening was that "no medical restrictions related to [his] housing assignment were necessary" (id. ¶ 19) and that he had an "evident ability to ambulate with ease and maneuver appropriately throughout the Moore County Detention Center" (id. ¶ 20).

Plaintiff was seen a number of times for medical treatment during his time in Moore County. On March 18, 2015, he submitted a Medical Request complaining of pain, and was

5

seen the next day on March 19, 2015, but refused the pain medication offered. (Id. ¶ 22 and Ex. 1008, 1015.) On March 24, 2018, Plaintiff complained of pain and a headache and requested an extra blanket. Nurse Donaldson examined him on March 26, 2015, and found a small amount of bruising on one of Plaintiff's knees. (Id. ¶ 23 and Ex. 1009, 1016-17.) She did not provide him an extra blanket, but did give him Percogesic for pain pursuant to a protocol put in place by PA Maldonado. (Id. and Ex. 1041.) He was also continued on blood pressure medication, Pepcid, and Antivert. (Id.) On May 2, 2015, Plaintiff submitted a medical request to be seen for his multiple sclerosis. (Id. ¶ 24 and Ex. 1011.) Nurse Donaldson responded on May 5, 2015, and notified him that she would schedule an appointment with a neurologist and that she was waiting for a call back from the neurologist, Dr. Sinclair, for an appointment date and time. (Id.) Later that month, on May 26, 2015, Plaintiff submitted another medical request to be seen for his multiple sclerosis. (Id. ¶ 25.) Nurse Donaldson responded that she had scheduled him for an appointment with Dr. Sinclair at Pinehurst Neurology. (Id.) On August 4, 2015, Plaintiff was seen by Dr. Sinclair, who noted worsening symptoms of multiple sclerosis with tremors and back pain, and recommended a referral to a specialist at the University of North Carolina. (Id. ¶ 26 and Ex. 1006.) He also noted two medications as "failed", and did not forward any additional prescriptions or recommendations to jail staff. (Id. ¶¶ 26-27 and Ex. 1006.) Nurse Donaldson notes that Plaintiff expressly refused to take the two medications noted by Dr. Sinclair due to the risk of negative side effects. (Id.) Nurse Donaldson attempted to schedule an appointment with a specialist at the University of North Carolina, but was told that the referral had to come directly from Dr. Sinclair's office. (Id. ¶ 29.) She states that she followed up with Dr. Sinclair's office to request

6

a direct referral for Plaintiff to see a specialist on three separate occasions, as further outlined below.  (Id. ¶¶ 30-32.)

On September 21, 2015, Plaintiff fell at the Detention Center.  (Id. ¶ 35.)  Nurse Donaldson responded to the fall and helped stabilize him for transportation to the hospital.  (Id. and Ex. 1005, 1025-32)  After his assessment at the hospital, Plaintiff "had a clear CT scan and clear x-rays of his spine, shoulder, and knee" and was diagnosed with contusions, was given pain medication, and was discharged the same day.  (Id.)  Defendant Donaldson examined him the next day and, after Plaintiff reported back soreness, she provided him with an ice pack.  (Id. ¶ 36 and 1005.)  That same day, PA Maldonado issued an order to place Plaintiff in a "bottom bunk."  (Id. ¶ 37 and Ex. 1041.)

On October 19, 2015, Plaintiff submitted a request to be seen for back pain.  Nurse Donaldson examined him the next day and PA Maldonado replaced one pain medication with another.  (Id. ¶ 38 and Ex. 1013, 1018-19, 1042.)  Nurse Donaldson also contacted Dr. Sinclair's office and requested that they set up an appointment for Plaintiff with a specialist and noted in Plaintiff's chart that they were "awaiting UNC referral."  (Id. ¶ 30 and Ex. 1005, 1018.)

Two weeks later, on November 4, 2015, Plaintiff submitted a Medical Request, requesting to be moved to a cell back upstairs.  (Id. ¶ 39 and Ex. 1005, 1014.)  Nurse Donaldson evaluated him and noted that he had no swelling and could walk without difficulty.  (Id. and Ex. 1014, 1020.)  Nurse Donaldson saw him again the next day, on November 5, 2015, based on his complaints of pain, and she entered an order allowing him to have a walker, and recommended he rise slowly and sit while showering.  (Id. ¶ 40 and Ex. 1014, 1021, 1042.)

7

She also contacted Dr. Sinclair's office again, requesting that Plaintiff be scheduled with a specialist at UNC. (Id. ¶ 31.) He was continued on Motrin for pain. (Id. at Ex. 1042.)

On November 14, 2015, Plaintiff was seen by another provider, LPN William David Chavis, for back and groin pain and a history of two hard stools. Plaintiff then received Colace as treatment. (Id. ¶ 41 and Ex. 1022-23.)

Plaintiff's medical records reflect that Plaintiff was seen again on November 23 and 24, 2015. He refused Percogesic for pain and requested Motrin, but PA Maldonado had directed that Motrin was not to be given "for now" due to gastrointestinal upset. (Id. Ex. 1007, 1043). He was seen again on December 8, 2015, regarding a request that the walker be discontinued, with a notation that he "only carr[ies] it around and using as clothes line walks in cell without it." (Id.) He was seen again a week later on December 15, 2015, and again on January 5, 2016, with a notation that he was "voicing no complaints." (Id.) He was seen again on January 25, 2016, was walking without assistance and showering without a chair. The record for that visit also reflects that Nurse Maldonado again called Dr. Sinclair regarding the UNC referral. (Id.) In her affidavit, Nurse Maldonado notes that she contacted Dr. Sinclair's office to follow up then, after having waited a "reasonable time for Dr. Sinclair's office to forward the necessary referral, medical records and set up an appointment." (Id. ¶¶ 30-33.)

Plaintiff's medical records reflect that he was seen again on February 17, 2016, with a report of "no recent problems related to legs, neck, back or knee to report. All is stable." (Id. at 1007.) His medications were renewed, blood tests were done, and on March 15, 2016, he was transferred out of the Detention Center, to the State Department of Corrections. (Id. at 1043.)

8

<u>Facts Related to Defendants Godfrey and Moore's Motion</u>

Defendant Godfrey and Defendant Moore have also refiled a joint Motion for Summary Judgment. Both Defendants attached affidavits to the Brief [Doc. #67] in support of the Motion. In Defendant Moore's Affidavit (Brief, Attach. 1), he states that he is aware that Plaintiff alleges that he was place in administrative segregation without cause, but that Plaintiff was never placed in any housing "without a valid concern for the safety and wellbeing of [Plaintiff] and/or other inmates." (Id. ¶ 5.) Defendant Moore attaches an Activity Log as an exhibit to his Affidavit. Referring to the log, he reports that, from February 5, 2015 until July 16, 2015, other officers handled Plaintiff's cell assignments and assigned him to Red and Blue Blocks, which are not considered to be administratively segregated housing. (Id. ¶ 6.)[1] However, Moore acknowledges that, on July 16, 2015, he moved Plaintiff to a downstairs cell in Green Block in order to separate Plaintiff from other inmates who claimed that Plaintiff was "bullying" them, including three who filed formal complaints with jail staff. (Id. ¶ 7.) Defendant Moore states that he did this in order to separate Plaintiff from those other inmates "for the safety and security of the inmates, staff, and the facility." (Id.) When this occurred, Defendant Moore also intended to remove bed linens and a blanket that Plaintiff lost after being found guilty of two policy violations.[2] However, Defendant Moore ultimately allowed

---

[1] Based on the Activity Report attached to the Affidavit, it appears that Plaintiff's cell in the Blue Block from February 5, 2015 to March 23, 2015 was upstairs. (Affidavit Ex. A [Doc. #67-1 at 6].)

[2] According to Plaintiff's Declaration [Doc. #55 at 2] , his bed linen and blanket were taken because Plaintiff had walked around outside his cell during the day with his blanket wrapped around him to stay warm, in violation of jail policy.

9

him to keep the bed linen, in light of Plaintiff's multiple sclerosis and the new housing assignment. (Id.) The Activity Report reflects this as follows:

> For the safety and surety of the inmates, staff and facility; inmate Thomas Shield was reclassified [] for the following reasons. Inmate Shield [h]as had trouble with four other inmates in Green Block. They all [were] moved but the one common denominator is inmate Shields. Inmate Shields said that because of his MS that he needs to keep[] his linen and needs to be under them most of the time[, t]hat he lost due to being found guilty of 2 "C" violations. Inmate Shields [h]as had three other inmates complain about him bully them in Green Block on the kiosk. I spoke with the nurse about the linen and to be on the safe side, as long as inmate Shields is in [administratively segregated housing] he can be under bedding per Lt. Moore.

(Id. at 8.)

Defendant Moore states that the Activity Report then shows that, on September 14, 2015, another officer moved Plaintiff into an upstairs cell on Yellow Block. (Id. ¶ 8.) Defendant Moore states that he did not make this decision, was not aware of any problem Plaintiff had with the assignment, and that the move did not involve any disciplinary reason. (Id.) Plaintiff fell a week later on September 21, 2015 and was assigned to a downstairs cell after the fall and until he left the Detention Center in March of 2016. (Id.) As to Plaintiff's medical treatment, Moore contends that he relied on the judgment of medical professionals working at the Detention Center, never assigned Plaintiff to housing that was contrary to any instructions from those staff, and never placed Plaintiff in any restraints that would have aggravated a medical condition. (Id. ¶¶ 10-11.)

For his part, Defendant Godfrey asserts that "[a]t no time relevant to this action did [Plaintiff] ask me why he was placed in 'administrative housing/maximum security' without any write-up or rule violation." (Brief, Attach. 2, ¶ 5.) He adds that he believes Plaintiff was "never placed in any housing for disciplinary reasons without a valid concern for the safety

and wellbeing of [Plaintiff] and/or other inmates." (Id.) He also claims that he had no personal interaction with Plaintiff while he was in the Detention Center, and that although Plaintiff filed a number of initial grievances, Plaintiff did not appeal any grievance to Defendant Godfrey. (Id. ¶ 7.) Defendant Godfrey notes that this is true for both grievances related to medical care and housing assignments. (Id.)

Facts In Plaintiff's Declaration

Plaintiff submitted a Declaration [Doc. #55] in support of his Response to Defendants Godfrey and Moore's prior Summary Judgment Motion, and incorporates it by reference in his Response to the present Motions. In the Declaration, he largely repeats the allegations in the Complaint or states facts that do not appear clearly relevant to his claims. However, he does state that Defendant Donaldson once refused him an extra blanket or "effective pain medication without side effects" after his multiple sclerosis symptoms worsened and that he refused the medication she provided because it made him sick. (Id. ¶ 8.) He states that she also refused to schedule an appointment with a specialist at the University of North Carolina to examine Plaintiff's multiple sclerosis symptoms. (Id.) He does admit that he saw Dr. Sinclair instead. (Id. ¶ 12.)

Regarding his housing situation, Plaintiff states that while in administrative housing, he was placed in restraints when out of his cell and that this somehow aggravated his multiple sclerosis symptoms. (Id. ¶ 10.) He denies bullying any other inmates to cause his transfer into administrative housing. (Id. ¶ 11.) He admits that after the fall he continued to request to be moved back upstairs, and states that this was because he sought to be moved to general

11

population upstairs in order to have more room to move around and walk to ease his pain and to end the practice of him being placed in restraints when he left his cell. (Id. ¶ 14.)

<u>Summary Judgment Standard</u>

Summary judgment is appropriate when no genuine issue of material fact exists. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. <u>Id.</u> The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson</u>, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. <u>See, e.g.</u>, <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994); <u>see also</u> <u>Anderson</u>, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

<u>Discussion</u>

<u>Defendant Donaldson's Motion for Summary Judgment</u>

Turning first to Defendant Donaldson's Motion, Plaintiff seeks to state a claim against Defendant Donaldson for deliberate indifference to serious medical needs in violation of his federal constitutional rights. Because of his status as a pretrial detainee at the time of the

events alleged, Plaintiff's claim of deliberate indifference to his medical needs would be evaluated under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment standard applicable to convicted prisoners. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983); see Bell v. Wolfish, 441 U.S. 520, 535 (1979). In practice however, the standards are the same for both pretrial detainees and convicted persons. See Brown v. Harris, 240 F. 3d 383, 388-89 (4th Cir. 2001) (holding that a pretrial detainee is entitled to the protections of due process, but concluding that the court need not decide whether the prisoner was convicted or a pretrial detainee because the standard is the same). Plaintiff must establish that Defendant Donaldson acted with "deliberate indifference" to his "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). More specifically,

> [a] medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." [Iko, 525 F.2d at 241] (internal quotation marks omitted). A defendant displays deliberate indifference where he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994))).

> "[D]eliberate indifference entails something more than mere negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing " 'that a [defendant] knew of a substantial risk from the very fact that the risk was obvious.' " Scinto, 841 F.3d at 226 (quoting Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015)).

13

A plaintiff can also establish "a prima face case of deliberate indifference" where " 'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it.' " Id. (brackets and ellipsis in original) (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, " '[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.' " Id. (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837).

Durand v. Charles, No. 1:16CV86, 2016 WL 7495811, at *4 (M.D.N.C. Dec. 30, 2016) (unpublished), report and rec. adopted, 2017 WL 389108 (M.D.N.C. Jan 26, 2017).

As stated above, mere negligence is not enough to constitute deliberate indifference. Additionally, the Eighth Amendment does not guarantee to a prisoner the medical treatment of their choice, and "'[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.'" Tunstall v. Perry, 1:15CV226, 2018 WL 1320265 at *2 (M.D.N.C. Jan. 5, 2018) (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)), report and rec. adopted, 2018 WL 1311532 (M.D.N.C. Mar. 13, 2018), aff'd 735 F. App'x 75 (4th Cir. 2018).

Here, the actual evidence in the case, which is composed mainly of Defendant Donaldson's Affidavit and Plaintiff's attached medical records, demonstrates that Defendant Donaldson provided Plaintiff with ongoing medical care during the time he spent in the Detention Center. As discussed above, she saw him around the time of his admission to the Detention Center and on a number of other occasions during his time there. She treated Plaintiff both before and after his fall, provided him with blood pressure and pain medication as allowed by PA Maldonado's standing orders, arranged an appointment with an outside specialist when Plaintiff reported problems with his multiple sclerosis, and repeatedly

14

attempted to arrange an appointment with an additional outside specialist as recommended by the first specialist. She did not refuse to see or treat Plaintiff on any occasion.

The Complaint actually contains no instances where Defendant Donaldson is alleged to have failed to treat Plaintiff or where she failed to provide constitutionally sufficient treatment. In the Statement of Claim, Plaintiff alleges that he attempted to declare medical emergencies on September 26 and 27 of 2015 due to pain and blood in his stool. However, the Complaint does not allege that Defendant Donaldson was involved and also reflects that this occurred on a weekend. Defendant Donaldson's Affidavit states that her work schedule during the relevant time period was for Monday through Friday. Thus, she could not have been responsible for this incident.

Plaintiff's Declaration alleges that Donaldson once refused him an extra blanket, that she did not provide proper pain medication, that he refused the medication she provided because it made him sick, and that she refused to schedule an appointment with a specialist at the University of North Carolina to examine Plaintiff's multiple sclerosis symptoms. Plaintiff's medical records do show that on March 24, 2015, Defendant Donaldson refused Plaintiff's request for an extra blanket. (Medical Records at 1009.) However, the Activity Log also reflects that Defendant Moore, upon Plaintiff's assignment to administrative housing, was going to remove Plaintiff's linens, but that he agreed to allow him to keep them after speaking with "the nurse." Thus, she did generally see that Plaintiff had access to necessary linens, and the question of whether or not he needed an extra blanket beyond those she allowed is merely a disagreement over treatment. That does not support a claim of deliberate indifference.

15

As for pain medication, on March 24, 2015, Defendant Donaldson provided Plaintiff with Percogesic for pain pursuant to Maldonado's standard protocol. Plaintiff's records show that he took this medication at times for months and even at a previous time when he was incarcerated at the Detention Center. (Id. at 1009, 1013, 1017, 1019, 1041-43.) He refused to take it on November 24, 2015, and requested Motrin instead. (Id. at 1043.) However, this was denied pursuant to PA Maldonado's orders because of gastrointestonal issues caused by the Motrin. (Id.) He thereafter continued receiving Percogesic. (Id.) In no way does this course of treatment qualify as deliberate indifference by Defendant Donaldson. As already stated, she treated Plaintiff repeatedly and did not ignore him or his conditions. She instead provided medication as needed within the parameters set by PA Maldonado. Obviously, Plaintiff disagrees with some of the treatment decisions. However, again, disagreements with the treatment provided do not amount to constitutional violations absent exceptional circumstances not present here.

As for referral to a specialist, the record clearly reflects that Defendant Donaldson did arrange for Plaintiff to see Dr. Sinclair, a local neurologist, and that, when Dr. Sinclair recommended a specialist at the University of North Carolina, she worked to arrange that appointment by contacting the specialist's office. When the office informed her that the referral needed to come from Dr. Sinclair, Defendant Donaldson contacted Dr. Sinclair's office on three separate occasions attempting to obtain that referral. Although she was ultimately unsuccessful in obtaining the referral prior to Plaintiff's transfer from the Detention Facility, Defendant Donaldson's actions do not demonstrate deliberate indifference to Plaintiff's need to see a specialist. Again, Plaintiff may believe that she should have sent him

directly to the specialist at the University of North Carolina without first sending him to Dr. Sinclair. However, this is yet another disagreement with treatment that cannot support a claim under § 1983.

Finally, Plaintiff may be claiming that Nurse Donaldson was somehow responsible for his being placed in administrative housing based on his medical condition and/or being housed in an upstairs cell at the time that he fell and that this violated his federal constitutional rights. The record is simply devoid of any evidence to support this claim. Plaintiff makes accusations and allegations to this effect in his Complaint and other pleadings. However, he provides no actual evidence that Defendant Donaldson had any say in housing assignments, either to cause or prevent his assignment to administrative housing or the upstairs cell. In his current Response, Plaintiff argues that it is clear from the Activity Report that Defendant Moore consulted with Defendant Donaldson about his cell assignments because he asked her about bed linens and an extra blanket when transferring Plaintiff to the Green Block. Although this did occur, it shows only a question about bedding, not a question about the assignment itself, much less that Defendant Donaldson possessed authority over that assignment.

Defendant Donaldson affirmatively states in her affidavit that she had no control over Plaintiff's housing assignment and that others were responsible for that assignment. This is supported by the Activity Report and Defendant Moore's Declaration, which indicate that on July 16, 2015, Defendant Moore assigned Plaintiff to what Plaintiff describes as administrative housing based on problems he had with other inmates. The Activity Report also reflects that other persons effected cell reassignments of Plaintiff during his time at the Detention Center,

but Defendant Donaldson is not among them. Plaintiff has produced nothing beyond mere allegations to counter Defendant Donaldson's evidence that she did not control his cell assignments. This is not sufficient for Plaintiff's claim to survive summary judgment.

Moreover, even if Defendant Donaldson had some ability to recommend that Plaintiff be assigned to a lower level cell, Plaintiff has not shown that her failure to do so rises to the level of deliberate indifference to his serious medical needs. Indeed, Plaintiff himself continued to request assignment to an upper level cell even after his fall in September 2015.

For all of these reasons, Plaintiff's claims against Defendant Donaldson fail and should be dismissed. The Court will therefore recommend that Defendant Donaldson's Motion for Summary Judgment be granted.

<u>Defendants Godfrey and Moore's Motion for Summary Judgment</u>

The Complaint does not set out claims against Defendants Godfrey or Moore based directly on the medical treatment Plaintiff received while at the Detention Center. Nor could it, given that they did not control Plaintiff's medical treatment. Instead, Plaintiff's claims against them stem from his housing assignments. As to that issue, the evidence that is in the record reflects that Defendant Moore transferred Plaintiff into administrative housing based on problems between Plaintiff and other inmates at the Detention Center. The Complaint alleges that Defendant Moore personally informed him that he was placed in administrative housing because he was "running the block," and told Plaintiff's sister that he was in administrative housing due to an issue with a blanket. Further, Defendant Moore's Affidavit and the Activity Log state that Defendant Moore placed Plaintiff into administrative housing because he had trouble with four other inmates who accused him of bullying them. The

18

Activity Log reflects that all of them would be moved but Plaintiff needed to be kept separate from multiple other inmates who had filed complaints about him, and that Plaintiff needed to keep his blankets and bed linens because of his MS, which he could do in Green Block. Thus, whether described as "running the block" or "bullying," it is clear that Plaintiff was placed in administrative housing based on difficulties with a group of other prisoners and a need to separate him from them. The question then becomes whether or not that decision potentially Plaintiff's federal constitutional rights.

"By definition, pretrial detainees have not been convicted of the crimes with which they are charged. For that reason, the Supreme Court held in <u>Bell v. Wolfish</u>, [441 U.S. 520, 535-37 (1979),] they retain a liberty interest in freedom from 'punishment,' even while they are detained to ensure their presence at trial." <u>Dilworth v. Adams</u>, 841 F.3d 246, 251 (4th Cir. 2016). An inference of punishment may arise from overly restrictive conditions, but "in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." <u>Bell</u>, 441 U.S. at 540. Plaintiff does not appear to allege that the restrictions to which he was subjected were, in and of themselves, so restrictive that they amounted to punishment. In any event, he certainly fails to support this with any evidence. Nevertheless, punishment can also be established by "expressed intent to punish on the part of detention facility officials," and can be inferred if a "restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless." <u>Id.</u> at 538-539. Thus, "[t]o establish that a particular condition or restriction of his confinement is constitutionally

19

impermissible 'punishment,' the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." <u>Martin v. Gentile</u>, 849 F.2d 863, 870 (4th Cir. 1988).

Here, the evidence is clear that Defendant Moore placed Plaintiff in administrative housing in Green Block in order to separate him from other prisoners with whom he was having difficulties or disagreements and who had filed complaints about him. Defendant Moore describes this in his Affidavit as a transfer based on "the safety and security of the inmates, staff, and the facility." (Moore Aff. ¶ 7.) Plaintiff claims that it was phrased to him by Defendants as "running the block." Regardless, the expressed intent was to remove him from the situation and prevent any escalation of hostilities, rather than to punish him. Further, as the United States Supreme Court stated in <u>Bell</u>,

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

<u>Bell</u>, 441 U.S. at 540, n.23 (quoting <u>Pell v. Procunier</u>, 417 U.S. 817, 827 (1974)). Defendant Moore's decision to place Plaintiff in administrative housing falls squarely within the area of deference described by the Supreme Court.

Plaintiff also alleges that Defendant Moore assigned him to or kept him in administrative housing in "retaliation" for his medical condition. As phrased, this claim is not supported by any evidence and simply does not make logical sense. There is absolutely nothing

20

in the record, either in the form of evidence or factual allegations, that Defendants or anyone else was upset, angered, or annoyed by Plaintiff's medical condition so that they might "retaliate" against him based on that condition. If anything, the record in the Activity Log reflects that Defendant Moore took into account Plaintiff's need to keep his bed linens and blanket and his need "be under them most of the time" due to his multiple sclerosis, and determined that this need, and the need to keep Plaintiff separated from the other inmates who had filed complaints about him, could best be accommodated by placing Plaintiff in administratively segregated housing. This is, again, among the type of discretionary decisions officials must regularly make in determining how best to maintain security and order and operate the institution in a manageable fashion.

Adding to that fact, Defendant Moore raises the defense of qualified immunity. Qualified immunity shields government officials from liability for their conduct, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). If the Court determines that the conduct violated plaintiff's constitutional rights, then the Court must determine whether the right was "clearly established" at the time of the violation. A law is clearly established "when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (internal quotation omitted). Here, for the reasons just set out, Defendant Moore did not violate Plaintiff's constitutional rights by placing him into administrative housing in order to separate him from inmates who complained about Plaintiff. Further, it would not have been "clearly established" at the time it occurred that

21

Defendant Moore could not act in this manner. In fact, as noted above, the law is to the contrary in that it gives jail administrators wide discretion in making these types of decisions. Therefore, Defendant Moore is entitled to qualified immunity on this claim.

As for Defendant Godfrey, Plaintiff alleges that he complained of the housing assignment to Defendant Godfrey, that Defendant Godfrey told him he was investigating or would investigate, and that Defendant Godfrey failed to get back to him. Plaintiff sets out no constitutional requirement that Defendant Godfrey review the lawful administrative housing decisions made by Defendant Moore or that he respond to the alleged inquiries of Plaintiff or his family. Therefore, Plaintiff cannot maintain this claim for relief. Defendants Godfrey and Moore's Motion for Summary Judgment should be granted as to Plaintiff's claims that they violated his rights by assigning him to administrative housing during part of his stay in the Detention Center.

The final claim set out against Defendants Godfrey and Moore is Plaintiff's contention that they improperly housed Plaintiff in an upstairs cell despite medical limitations that made him unsuitable for such housing and that he then fell and injured himself as a result. The Complaint alleges that Plaintiff was moved into the cell where he was housed at the time he fell on September 14, 2015. (Complaint, Attach, ¶ 22.) According to Defendant Moore's Affidavit and the Activity Log, this occurred at the direction of Detention Officer Jacob Schlumpf, not the named Defendants. In fact, Defendant Moore states affirmatively that he did not make the decision to move Plaintiff to that cell and was never aware that Plaintiff had a problem with that assignment. (Moore Aff. ¶ 8.) Defendant Godfrey echoes this by stating that he received no grievances regarding this housing assignment. (Godfrey Aff. ¶ 7.) In fact,

22

although Plaintiff alleges that he questioned this assignment and discussed it with other workers at the Detention Center, he provides no evidence that he informed Defendants Godfrey or Moore of the assignment or any danger it posed to him or that they were made aware of the assignment by other means. Plaintiff only remained in the cell in question for a week before falling down the stairs. Defendants became aware of the situation at that point, but Plaintiff was thereafter housed on the bottom floor of the Detention Center for the remainder of the time there. (Moore Aff. ¶ 9.)

Moreover, as noted above with respect to Defendant Donaldson, Plaintiff continued to request that he be moved back to an upstairs cell even after his fall. (Donaldson Aff. ¶ 39.) Thus, even if Plaintiff could show that Defendants Moore and Godfrey were aware of the assignment, the fact that Plaintiff himself requested an upstairs cell after his fall would refute any claim that housing him in the upstairs cell amounted to deliberate indifference. Plaintiff explains his request as being based on a desire for more freedom of movement. (Plaintiff's Declaration ¶ 14.) Nevertheless, the fact that he was willing to accept the risk even after his fall indicates that he did not regard that housing assignment as a significantly dangerous condition. It is not clear then why Defendants should have regarded it as such even before the fall.

Finally, Plaintiff also filed two documents which are before the Court. The first is entitled "Plaintiff [sic] Request for Judicial Notice of Adjudicative Facts and Opportunity to Be Heard." [Doc. #76.] The second is entitled "Plaintiffs' [sic] Evidentiary Objections and Court Sanctions Against Defendant Parties and Their Attorneys of Record." [Doc. #77.] In those filings, Plaintiff raises what he contends are points of disagreement between the filings

23

of the Parties, sets out issues regarding the use of certain terms,[3] and claims that he received delayed service of certain filings because Defendants' attorneys used an outdated address for mailing. He seeks rulings in his favor on the disputed issues and sanctions. For the reasons already set out, the Court should rule in favor of Defendants, not Plaintiff, on the substantive issues in the case. As for any sanctions, disagreements between the parties are normal parts of a lawsuit, not conduct that could remotely support sanctions. Any delayed service due to the use of an incorrect address is also not sanctionable conduct, particularly where, as here, Plaintiff reports no harm. These two filings by Plaintiff should be denied.

IT IS THEREFORE RECOMMENDED that Defendant Donaldson's Motion for Summary Judgment [Doc. #61] be granted, that Defendants Godfrey and Moore's Motion for Summary Judgment [Doc. #66] be granted, that Plaintiff's "Plaintiff Request for Judicial Notice of Adjudicative Facts and Opportunity to Be Heard" [Doc. #76] and "Plaintiffs' Evidentiary Objections and Court Sanctions Against Defendant Parties and Their Attorneys of Record" [Doc. #77] be denied, and that this action be dismissed.

This, the 11th day of February, 2021.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[3] For example, Plaintiff seeks to clarify that Moore County Detention Center has only two types of housing: general population (Red and Blue Blocks) and administrative segregation (Green and Yellow Blocks). This is consistent with the information presented in the record, and nothing in that filing would create a genuine issue of fact or affect the analysis set out above.

24